## TEXAS & NEW ORLEANS RAILROAD COMPANY v. ED. McDONALD.

Decided May 15, 1909.

**1.—Limitation—Amended Petition.**

An amendment to a petition which sets up no new cause of action or claim and makes no new demand, but simply varies or expands the allegations in support of the cause of action already propounded, relates back to the commencement of the action, and the running of the statute of limitation against a claim so pleaded is arrested at that time.

**2.—Pleading—New Cause of Action.**

Where in both petitions the gravamen of the charge was that the defendant's employes negligently ran a car over plaintiff, the mere fact that under the

amended petition the further fact was alleged, in substance, that said employes so negligently ran the car with knowledge of plaintiff's peril, did not so change the transaction as to present a new cause of action, though the amendment be regarded as setting up an additional ground or act of negligence.

### 3.—Negligence—Railway—Discovered Peril.

Where plaintiff was sitting under one of a string of detached cars of a train when injured by the sudden movement of the car, which was set in motion by the engine which came out of the defendant's yard and pushed other cars of the train against the string, and there was testimony tending to show that the brakeman working with the crew operating the train, who went ahead of the engine to prepare the way and gave the signal to the engineer to make the movement, saw plaintiff's position a few minutes before the movement and must have known that he was still in that position when such signal was given, the jury were authorized to find that he knew of plaintiff's peril at the time the cars were moved.

### 4.—Discovered Peril—Charge—Weight of Evidence.

From an instruction to find for defendant unless the jury believed from the evidence that its employe actually saw plaintiff in a position of danger and knew he was in danger should the car be moved, and saw him in time to have prevented the injury by the use of the means and efforts that a man of ordinary prudence could and would have used under the circumstances, the jury could not have understood that the judge thought that a man of ordinary prudence situated as the employe was could and would use such means, regardless of whether he saw or knew the peril. But if the employe knew of such peril, a man of ordinary prudence would have made every effort and used every means at his command to prevent the injury, and the court could have so charged.

Appeal from the District Court of Harris County. Tried below before Hon. Norman G. Kittrell.

*Baker, Botts, Parker & Garwood* and *Lane, Jackson, Kelly · & Wolters,* for appellant.—An amendment of pleading which introduces a new or different cause of action, and makes a new or different demand not before introduced or made in the opening suit, does not relate back to the beginning of the action so as to stop the running of the statute, but is equivalent to a fresh suit upon a new cause of action, and the statute continues to run until the amendment is filed.

Neither the original nor the first amended nor second amended original petitions contain any allegation charging or declaring upon a case of discovered peril and subsequent negligence on the part of the defendant. Phoenix Lumber Co. v. Houston Waterworks Co., 94 Texas, 456; American Salt Co. v. Heidenheimer, 80 Texas, 344; McLane v. Belvin, 47 Texas, 493; Williams v. Randon, 10 Texas, 74; Bigham v. Talbot, 63 Texas, 271; Railway Co. v. Pape, 73 Texas, 502; Railway Co. v. Wyler, 158 U. S., 285, 289, 298; Whalen v. Gordon (Cir. Ct. of Appeals, 8th Cir., Northern Dist. of Iowa), 95 Fed. Rep., 314; 1 Am. & Eng. Ency. of Plead. and Prac., pp. 622, 623.

While it has been frequently held that the mere amplification of the original pleading by amendment in negligence cases, for the purpose of stating more specifically the particulars of the negligence originally charged or the injurious results thereof in connection with and as part of the occurrences originally alleged, does not constitute a departure from pleading such as to constitute a new cause of action, we have found no case going to the extent of holding that the allegation by amendment of a state of case showing discovered peril and subsequent

failure to avert injury by all means and agencies at hand, is not essentially a new and different action from one based originally on allegations of negligence in failing to use ordinary care to discover the danger and give warning, in response to which contributory negligence would always be a good defense; and we insist that the tests of the essential departure for which we contend in this case, as announced and applied by our Supreme Court in the case of Phoenix Lumber Company v. Houston Waterworks Company, above cited, and also in the case of Whalen v. Gordon, above cited, if applied to the points involved in our special demurrers, raising limitations, support our position.

*R. R. Hazlewood* and *Lovejoy & Parker,* for appellee.

PLEASANTS, CHIEF JUSTICE.—This is a suit to recover damages for personal injuries brought by appellee against appellant. There was a former appeal in the case, the opinion of the Supreme Court on said appeal being reported in 99 Texas, 207. The second amended petition upon which the trial was had from which the former appeal was taken, after alleging that plaintiff was injured on July 24, 1903, while in the employ of one Shea, a contractor who was unloading gravel from cars on a siding of defendant road in the city of Houston, by being struck and run over by said gravel cars which were suddenly put in motion by the employes of defendant backing an engine on said siding and striking such gravel cars, contains the following allegations of the negligence relied on to entitle plaintiff to recover for the injuries received by him:

"That plaintiff was struck and injured as aforesaid as the direct and proximate result of the negligence and carelessness of the defendant, its servants and employes, in this, that the said siding was not generally used by defendant at the time in question, and for a year or more prior thereto had been devoted almost exclusively to handling cars containing gravel hauled by defendant for said Shea and others; that the defendant had in force at the time a rule or order forbidding its servants and employes to back any engine or cars against cars standing upon said siding for unloading without first giving warning to any persons who might be engaged in the work of unloading such cars, and without first ascertaining that no person connected with the work of unloading them was in a position of peril should the cars be suddenly moved, which said rule or order was well known to said servants and employes in charge of said engine. . . . That the said siding was located in a public street; that it was, and for more than a year had been, the practice and custom of laborers engaged in the work of unloading cars on the said siding, and of other persons working in the neighborhood of said siding at the noon hour, to eat their meals and rest near to and beneath the said cars, in the shade thereof, believing they were safe in so doing; and it was the custom and practice of children in the neighborhood of the said siding at the said time and for a long time prior thereto to play upon and beneath the said cars, all of which facts were well known to said defendant and its servants and employes in charge of said engine; and said servants and employes, so knowing of the said rule and order and of said practice and custom,

and knowing that at the time plaintiff and his fellow laborers were probably eating their dinners, or resting near to or beneath the said cars, and might be in a position of peril should the cars be suddenly moved, without warning or notice ran the said engine against the said cars without ringing the bell or sounding the whistle or giving any warning or notice whatever, and without using any care to ascertain whether plaintiff and his fellow laborers were or were not in positions of peril should the cars be suddenly moved; that had the said servants and employes looked, as it was their duty to do, they could and would have seen plaintiff and his fellow laborers, and could and would have seen that they were in positions of peril should the said cars be suddenly moved without warning; that had the bell been rung or the whistle sounded, or any other signal given, plaintiff could and would have discovered the approach of said engine and cars and have escaped injury; and plaintiff further says that his said injury was not the result of any negligence on his part, but on the contrary he was in the exercise of ordinary care under the circumstances."

After the return of the mandate on the former appeal the plaintiff, on December 16, 1907, filed a third amended petition which contains, in addition to the allegation of negligence contained in the second amended petition, the following allegations:

"The said servants and employes in charge of and connected with the said engine, well knowing that at the time plaintiff and his fellow laborers were probably eating their dinners or resting near to or beneath the said cars, and were probably in positions of peril should said cars be suddenly moved, and seeing plaintiff seated by the side of one of said cars, and realizing the danger to which he would be exposed should the said car be suddenly set in motion, nevertheless carelessly and negligently backed and caused to be backed the said engine and cars with great force and violence, against the cars between McKee and Hardy Streets, and thereby setting the said cars in sudden motion and injuring plaintiff as above stated."

The defendant's answer contains a special exception raising the question of limitation as to the additional allegations of negligence contained in the petition before set out. Further answering, the defendant denied all of the allegations of the petition, and specially pleaded limitation of two years as to plaintiff's right to recover on the grounds of negligence alleged for the first time in the third amended petition. It also pleaded contributory negligence on the part of plaintiff. The trial by a jury in the court below resulted in a verdict and judgment in favor of plaintiff in the sum of $7,500.

The evidence shows that at the time plaintiff was injured he, with a number of others, was in the employment of Mr. Shea, a contractor engaged in laying pavements in the city of Houston. The gravel used in making this pavement was hauled to Houston by the appellant road and the cars loaded with gravel were placed for unloading on a siding of defendant road on Burnett Street in said city. This street extends from west to east through the northwestern portion of the city. The yards of appellant road are situated at the western end of the street and extend eastwardly along the south side of said street a distance of several blocks. These yards are enclosed with a high fence against

which the west end of Burnett Street abuts. The siding upon which plaintiff was injured leaves defendant's main track in the yards and extends along Burnett Street for a distance of about 300 yards, passing through a gate in the fence before mentioned. The east end of the siding is near Hardy Street, which crosses Burnett Street at right angles. Between Hardy Street and the gate before mentioned Burnett Street is crossed at right angles by McKee, Chapman and Gano Streets in the order named. These streets are each sixty feet wide and are about 300 feet apart. The east end of the siding is about 35 feet west of the west line of Hardy Street.

On the day plaintiff was injured and for a day or two prior thereto he and a number of other employes of Mr. Shea were engaged in unloading gravel from a train of ten or twelve cars which had been placed on said siding to be unloaded. When the cars were placed on the siding the train was cut so that none of the streets crossing the siding would be blocked. The evidence is conflicting as to the number of cars east of McKee Street, the number fixed by the witnesses varying from three to six.

At the time plaintiff was injured he and the others engaged in unloading the cars had stopped work for dinner and plaintiff and two others were eating their dinner or resting in the shade of the south side of the second car from Hardy Street. Plaintiff was sitting on the end of a tie about the middle of the car facing east. While in this position and engaged in conversation with his companions the car under which he was sitting was put in motion by the engine which came out of defendant's yards through the gate before mentioned and took up the cars west of McKee Street, which had been unloaded, and pushed them across said street, against those connected with the one under which plaintiff was sitting. This movement of the cars was so sudden and unexpected that plaintiff was struck by the car beneath which he was sitting and both of his legs were so crushed that it became necessary to amputate them.

The evidence justifies the finding that the operatives of said engine failed to ring the bell or blow the whistle or give any warning that the engine was approaching or that any movement of the cars was to be made.

J. W. Buttermore, the field brakeman working with the train crew that was operating the engine and cars by which plaintiff was injured, testified in substance that on the occasion in question he went ahead of the engine when it came out of the yards to remove the empty cars from the siding and opened the gate at the head of Burnett Street to let the engine through, and then walked along down said street on the north side of the track until he reached the east side of McKee Street, where he stopped and waited for the engine, which in the meantime had taken up the cars west of said street; that he was at no time on the south side of the siding and did not go further down on the north side than 45 feet east of McKee Street; that when the engine with the empty cars approached McKee Street he was standing at or near the McKee Street crossing and signaled the engineer to come on, and went in and made the coupling to the cars east of said street; that he had not seen appellee and did not know and had no reason to suspect that

he or any one else was under or near the cars until after the coupling
was made and appellee had been injured.

All of the evidence shows that none of the other members of the
crew had any knowledge of appellee's being under or near the car until
after the injury occurred. The statements of Buttermore as to his not
going on the south side of the track at any time before the accident
occurred, and as to his position at the time of and immediately before
the coupling was made, is corroborated by several other witnesses.

Dick Lockett, a witness for plaintiff, testified: "My name is Dick
Lockett; I live in the third ward; I have lived in Houston about
twenty years, I guess; I know Ed McDonald; I know Mr. Shea, the
contractor, well; I worked for him the whole time he was here; I helped
to unload the cars on Burnett Street in the summer of 1903, and I re-
member when Ed McDonald got his legs run over on that street; I
wasn't far from him. I was right—I was just over on the opposite
side of him; he was over on this side and I was over on that side of the
cars; I was over on the north side and he was over on this side of me,
and I was just catercorner from him. I had been doing first one thing
and then another that day; they had me there as a kind of lookout—
a kind of straw boss; it was right about twelve o'clock, I think, when
he got hurt; we had just knocked off. Well, what I know about it, we
had just knocked off for twelve o'clock, and it was three cars sitting
there, and those fellows was over on the opposite side of me; I was on
the north side, and there was another fellow right on the corner from
McKee Street; he was hollering to me if I had enough dinner could I
spare him some, and I said I guessed so if he come down where I was,
and I was no distance from those fellows; if I had stooped down I
could have seen them; and he came around those cars, and he came
around—well, he wasn't far from me; that was one of the brakemen,
and how I knew he always followed that No. 2 engine; he came from
over in the other part of the yard—over in the south side of the yard
—that was to meet that engine; he was coming from the direction of
the roundhouse; when he came up he come right down by those men,
on the south side, and he went around the cars to the east end there,
where the three cars were sitting near McKee Street; they had cut
that crossing loose, and several cars on the west, and three cars were
cut loose and up across on the east end; where he passed was no dis-
tance from them at all—just a little path between the ditch and the
railroad; he just passed along there; he wasn't no distance from them
at all; it wasn't no time after the car struck that I knew McDonald
had got hurt, and I heard those fellows holler and the man who pulled
him out; he said McDonald had got hurt, and I ran down and helped
pull him out; I heard the man that got hurt holler; he was there moan-
ing and groaning; when I heard that hollering there was three cars
down there; this fellow, the brakeman, was about the middle of the car;
he was standing about the last car from those fellows; there was three
cars. Brakey, he was standing near the last car, the one next to Hardy
Street, and those fellows were next to McKee Street. I was just—well,
the whole business was just—it wasn't quite in the middle of the block,
because they just did clear the crossing on McKee Street, the three
cars was; the crossing at McKee Street was cut; there was a space be-

tween the three cars and the others to the west; this engine from the west end—you know they brought it—the engine came down there and struck them, and that caused the three cars to move; the engine and those cars just run together there, you know; the engine just struck those that was on the other side of the crossing and caused them to run over them men; the engine struck the cars on the west side of McKee Street; that's the way they were coming; they were coming from the west, and they struck those cars on the other side; those cars were standing still and those cars from the west was pushing in; the cars that were being pushed from the west came in contact with the cars on the east side of McKee Street, and that brought the cars together and they then shut up the crossing; of course, they were coupled up then; doing that caused those three cars to move in the direction of Hardy Street; Hardy Street is nearer to the point where the three cars were than McKee Street. I didn't hear any bell at all; I didn't hear any whistle, and there wasn't any ringing until they started to pull that train out after they heard that a man had been hurt, and when they pulled out they commenced ringing the bell and blowing the whistle, and I took the fellow out and rang up the telephone, and rang up the wagon, and they came out there and got him; the cars were flat cars; it was just about a half of car that wasn't unloaded and that was on the back end, but the two cars was near McKee Street that was unloaded; the one next to Hardy Street, it wasn't unloaded; it was to be unloaded after dinner, but they were going to pull it out and set it back with the other loads; it was there to be unloaded and about half of it had been unloaded; if it hadn't been moved they would have unloaded it after dinner—finished unloading it."

On cross-examination this witness further testified: "I couldn't tell you how far I was from Hardy Street; I was closer to McKee than to Hardy; I was between the fence and the ditch, on the outside of the ditch, between the fence and ditch; those men were sitting down there when I first came to notice them; I was going up that way, and there was a man hollering to me about dinner, and I heard them talking; they were sitting down like they were going to eat dinner; I don't know whether they was eating; didn't notice exactly the position they were occupying; I never paid no attention to them; they appeared to be under the edge of the car near the south edge; I don't know whether they was sitting on the rail or not, because I wasn't over there; they was about middleways of the car; they might have been resting just on the edge of the ties; I was looking at the man; I just seen them sitting there; they were not standing up at the time, they was sitting there. The man I spoke of as brakeman was about the middle of the last car that was unloaded—about the middle of the last car—about the middle of the car next to Hardy Street; when I first saw him he had his face turned west; the engine was coming from the west and that was the way he was looking—that way; at the time I first saw him he was standing still; when I first seen that gentleman he was coming from the S. P. yard; when he come through the gate on McKee Street he was on the same side those fellows were, and then he turned around those cars; I first saw him when I was standing over there between the ditch and the fence, and I saw him go through that gate at McKee

Street on the south side; there is an open gap that the railroad left there; I saw him go through that as if he was coming from the shop; he came on like he was going down Hardy Street, and then he stopped just about the middle of that car—that there unloaded car—and then he didn't do nothing; when I looked up and seen him I heard those fellows holler; at the time I heard those fellows holler he was right there about the middle of the loaded car, and he was there when this engine came down and struck against it, and coupled up to the car next to McKee Street; he didn't make any coupling; I didn't see any other brakeman around there; I didn't see any one around McKee Street; I never paid attention to but one man; at the time those cars struck and I heard those men holler, I didn't notice what he was doing—what he was looking at or what he was doing; if I seen the man I would know him; I don't know his name, but he worked over in the S. P. shop; I have made no effort to find out his name. (Counsel for plaintiff and defendant here accompanied witness to the hall for the purpose of identifying the person referred to by the witness.)    There was no one else there at all; no other brakeman was there; I first seen that brakeman on the south side coming through the gap; he was coming from towards the shop; I don't know where the engine was at that time; he was there over fifteen or twenty minutes before I realized the engine was coming down; he was there just about that time; I didn't know the engine or any cars were moving before I heard this man holler; I have not testified in this case before; I was there with the other colored men; I was a straw boss; I was there with the other men, and I am a colored man myself; I seen lots of men getting in shape to eat dinner on Hardy Street; I guess there was thirty-five or forty fixing to eat dinner under the shade trees; there was some trees gave shade on Hardy Street; this spur track lacks about three or four rails of going to Hardy Street; it is up near Hardy Street where it ends, and the trees are beyond that on Hardy Street; there were thirty-five or forty men getting in shade to eat, washing their face and hands.    I don't know Mr. Arledge; I seen a white man go in there, and went into that yard, but what his name was I don't know; I don't know what time he went in there; he went in while I was standing there. I have been living in Houston about twenty years; I was living here in 1903; I didn't testify on the former trial of this case."

Henry McDonald, a witness for plaintiff, testified: " . . . I was sitting down and Ed was sitting down; I was facing west; me and Ed was sitting face to face, and Tony Watts was there; he was lying under the car, on the flat of his back; he was down between the rails.    As I sat there with my face to the west and Ed's face to the east, I seen a man come up there; I have since seen that man; I saw him on the first trial of this case; I learned what his name is; they call him Mr. Buttermore; he was the same man I saw walk by me there that day; I have seen him today; I didn't know when he went by me that day what his occupation was; the first time I learned what his occupation was was when they brought him up here at Ed's trial; after he passed me I never turned to look which way he went; I don't remember seeing him after that; that was about ten minutes before those cars came over and run over Ed and cut off his legs; I think it was ten minutes;

he passed about as close to me as that man sitting there (indicating three or four feet); he come from the west, going down; as he passed by me he didn't give me and Ed any warning or say anything to us about a car moving, or that it was going to move."

On cross-examination he testified: "He didn't speak to me; I didn't say anything to him; there are weeds on that side; he was between me and the weeds; the weeds were mashed down. I testified in this case before; I told these gentlemen about seeing Mr. Buttermore in the other case, while the case was being tried; I know what a trial is; I know when the case was tried; I was here and testified; if I made no mistake I told them that; I think I told another man that; there was another man here I don't see now (Hazlewood); I told one of the lawyers that I saw him there on the side of the car; I told him that during the trial and before the trial was over; I testified on that trial about seeing this man Buttermore coming at that time; that while I was sitting there the man came along the south side of the car; I think Mr. Parker was here and conducted that trial, and I mean to say that during that trial I sat here in this witness chair and testified that while I was sitting there, and about ten minutes before this injury, I saw this man come along, and he came within a few feet of me; they told me it was Buttermore; I didn't know at that time when he came up there; I testified that he came along there and I saw him; I don't know whether he was present while I was testifying; I don't know nobody here in Houston much."

J. R. Arledge, a witness for plaintiff, testified that he saw Buttermore shortly before the accident occurred coming down the north side of the cars on Burnett Street, between McKee and Hardy Streets, and that he did not go nearer than 40 feet to the car under which appellee was sitting.

Defendant introduced testimony showing the distance from the ground to the bed of the cars and size and shape of the cars, from which it appears that it would have been impossible for Buttermore to have seen the appellee if he, as he testified, walked down the north side of the cars and only went a distance of 45 feet east of McKee Street. This evidence also tends strongly to show, if it does not conclusively establish, the fact that Buttermore could not have seen appellee from any position in which he was placed by the witness Arledge.

The first assignment of error complains of the ruling of the court in refusing to sustain appellant's exception to that portion of the petition in which it is alleged that defendant's employes in charge of the engine knew of plaintiff's perilous position at the time they ran the train against the car under which he was sitting. It is earnestly contended under this assignment that this allegation of the amended petition sets up a new cause of action, and the injury having occurred more than two years before the amended petition containing said allegation was filed, the cause of action asserted by said allegation was barred.

We do not think this allegation is such a departure from the original petition as to constitute a new cause of action. The rule is that "An amendment to a petition which sets up no new cause of action or claim and makes no new demand, but simply varies or expands the allegations

in support of the cause of action already propounded, relates back to the commencement of the action, and the running of the statute against a claim so pleaded is arrested at that point. But an amendment which introduces a new or different cause of action, and makes a new or different demand not before introduced or made in the opening suit, does not relate back to the beginning of the action so as to stop the running of the statute, but is equivalent to a fresh suit upon a new cause of action, and the statute continues to run until the amendment is filed." Whalen v. Gordon, 95 Fed. Rep., 305; Union Pac. Ry. v. Wyler, 158 U. S., 290.

In the case of Phoenix Lumber Co. v. Houston Waterworks Co., 94 Texas, 460, Judge Brown, speaking for our Supreme Court, says that the four tests for determining whether an amendment to a petition sets up a new cause of action are: "(1) Would a recovery had upon the original bar a recovery upon the amended petition? (2) Would the same evidence support both of the pleadings? (3) Is the measure of damages the same in each case? (4) Are the allegations of each (pleading) subject to the same defenses?"

He further says: "We are of opinion that the second and last furnish the best tests by which to determine the matter before us, and we can safely say that if the same testimony would not support the allegations in each of these pleas, and that the same defenses could not be interposed to each of them, they are not identical, and therefore the amended petition presents a new cause of action."

The question presented in that case was whether an amendment to a petition which declared upon an implied contract presented a new or different cause of action from that presented in the original petition which declared upon an express contract.

In the present case there can be no doubt that a judgment on the original petition would have been a bar to a recovery on the amendment. If we apply the tests selected by Judge Brown, it can not be held that the amendment in this case sets up a new cause of action. In both petitions the gravamen of the charge is that appellant's employes negligently ran the car over appellee, and the mere fact that under the amended petition the further fact was alleged, in substance, that said employes so negligently ran the car with knowledge of appellee's peril did not so change the transaction as to present a new cause of action. It was under the facts of this case a violation of duty on the part of appellant to run the car attached to the engine against the car under which appellee was sitting without giving warning of such movement, and this was the cause of action alleged in both petitions, and the knowledge by said employes of appellee's peril was only pleaded in avoidance of the defense of contributory negligence, and not as a part of the plaintiff's cause of action. If, however, the amendment should be regarded as setting up an additional ground or act of negligence, it would not change the cause of action. (Texas & Pac. Ry. Co. v. Buckalew, 34 S. W., 165; Texas & Pac. Ry. Co. v. Eberhardt, 91 Texas, 322; Missouri Pac. Ry. Co. v. Foreman, 46 S. W., 835; Caswell v. Hopson. 47 S. W., 54.)

The second, third, fourth and fifth assignments of error complain of the judgment on the ground that there is no evidence to sustain the

finding of the jury that any of the employes of defendant in charge of said engine saw or knew of plaintiff's perilous position at the time the cars were moved, and that such finding of the jury is so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust.

We think the evidence before set out sustains the verdict upon this issue. If the testimony of the witnesses Lockett and Henry McDonald is true, Buttermore, who went ahead of the engine to prepare the way, and who gave the signal to the engineer to make the movement of the train which resulted in plaintiff's injury, saw plaintiff's position a few minutes before the train was moved, and must have known that he was still in that position at the time he gave the signal for such movement to be made. If, as held by the Supreme Court upon the former appeal of this case (99 Texas, 207), appellee, who had no notice that the train would likely be moved, in placing himself in the position in which he was at the time he received his injury committed an act so reckless and void of care for his safety that he should, as a matter of law, be deemed guilty of negligence, it necessarily follows that Buttermore, who saw him in that position and who knew that the train was approaching, should be held to have known of his peril. The conflict in the testimony upon this issue was for the jury to determine, and we can not say that their verdict is so against the weight and preponderance of the evidence as to require or authorize us to disturb it.

The sixth assignment of error complains of the following paragraph of the court's charge:

"You are instructed that, in occupying the position he did, at the time he was hurt, plaintiff was, as a matter of law, guilty of 'contributory negligence,' and you will return your verdict for defendant, unless you shall believe from the preponderance of the evidence that defendant's employe, Buttermore, actually saw plaintiff in a position of danger and knew he was in danger should the car be moved, and so saw him in time to have prevented injury to the plaintiff by the use of the means and efforts that a man of ordinary prudence could and would have used under the circumstances, and believing that Buttermore was guilty of 'negligence' under the circumstances, and that such 'negligence,' if 'negligence' you find there was, was so directly the cause of plaintiff's injury that but for the same the injury would not have occurred, in which case you will return your verdict for plaintiff."

The objection urged to this charge is that the expression, "the means and efforts that a man of ordinary prudence could and would have used under the circumstances," implies the idea that a man of ordinary prudence could and would, as a fact, have used means and efforts under the circumstances, and is virtually a declaration of the judge to this effect; hence, this charge is on the weight of the evidence, contrary to law, and prejudicial to defendant. This criticism of the charge is without merit.

The jury could not have understood from the language used that the judge thought that a man of ordinary prudence situated as Buttermore was could and would have used means and efforts to have prevented appellee's injury, regardless of whether he saw or knew of appellee's peril. The issue of whether he knew of the peril of appellee was

clearly submitted to the jury, and if he did know of such peril there can be no difference of opinion upon the question of whether a man of ordinary prudence would have made every effort and used every means at his command to prevent the injury, and the court could have so charged.

We think none of the assignments present any error which requires a reversal of the judgment, and it is therefore affirmed.

*Affirmed.*

Writ of error refused.